On Rehearing
TATE, Judge.
Following rendition of our original opinion applications for rehearing were filed by both the plaintiff-appellee and defendants-appellants. All parties’ applications were granted to allow consideration of the various contentions advanced. Since our original opinion fully stated the facts and issues, we will, insofar as possible, avoid repetition thereof.
 After thorough reconsideration of the entire record, we have come to the conclusion that our original opinion correctly held that the plaintiff had borne his burden of proving the accident of October 16, 1956, from which his injuries allegedly resulted, but that we were in error in holding that Consolidated and its insurer were absolved from liability because the L. & A. railroad engineer had the last clear chance to avoid the accident.
Called to our attention by the plaintiff’s application for rehearing was controlling jurisprudence, previously not cited, to the effect that the doctrine of last clear chance can not be invoked by joint tortfeasors against one another; which we now expressly recognize and follow. Shield v. F. Johnson & Son Co., 132 La. 773, 61 So. 787, 47 L.R.A.,N.S., 1080; Abrego v. Tri-State Transit Co., La.App. 1 Cir., 22 So.2d 681. As these cases hold, it is well settled that where the negligence of two or more persons combines to cause an injury to a third person, all of the persons whose concurrent negligence contributed to the injury are liable in solido, and the injured third person, if without fault, has a right to collect his full damage from any or all of the defendants. See also Fontenot v. National Transfer Co., La.App. 1 Cir., 93 So.2d 254. No fault by plaintiff contributing to the evidence and barring his recovery is shown by the record, nor can any negligence of his coemployee, the railroad engineer, be imputed to the plaintiff in this suit by him against a third party. See, e. g., Alford v. Louisiana & Arkansas Ry. Co., La.App. 2 Cir., 38 So.2d 258.
Plaintiff is thus entitled to recover the damages sustained by him as a result of the accident of October 16, 1956, if negligence on the part of Consolidated was a proximate cause thereof. We thus do not find it necessary to discuss further any negligence on the part of the railroad engineer, for we will assume most favorably to the defendant that negligence on his part contributed to the accident.[1]
*811 I. Negligence of Consolidated/s Truck-driver as a Proximate Cause of the Accident.
The intentional obstruction by a truck of a main travelled railroad line in the heart of a heavily populated city is negligent and will foreseeably endanger the life and property of others, since it is reasonably foreseeable that the obstructing vehicle will hamper the inherently dangerous operation of heavy and hard-to-stop railway trains, foreseeably causing the danger of collision or (as here) the dangerous maneuver of a sudden train stop to avoid a collision. See, for instance, Bergeron v. Greyhound Corporation, La.App. 1 Cir., 100 So.2d 923, wherein it was held that conduct foreseeably increasing the hazard to public highway traffic and avoidable by the exercise of ordinary care creates an unreasonable risk or harm to others so as to constitute negligence. See also LSA-R.S. 14:-97, providing criminal penalties for “ * * the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult.” The dangerous situation created by the negligent conduct of the defendant’s truckdriver by blocking a main railroad line substantially contributed to the accident and was thus at least a concurrent proximate cause thereof.
To whatever extent a few seconds lack of observation or look-out by th$ railroad engineer might also have contributed to the accident, from a common sense point of view it is obvious that the primary reason for the accident was the inherently dangerous act of defendant employee in blocking a main railroad line. Further, as Justice McCaleb succinctly observed in Jackson v. Jones, 224 La. 403, 69 So.2d 729, 733, holding a contractor liable for creating a danger which through the intervening act of another tortfeasor caused injury to the plaintiff:
“The determination of the proximate or efficient cause of an accident, as distinguished from the remote cause, is sometimes difficult of practical application and often turns ‘upon the very nicest discriminations’. The Louisiana Mut. Ins. Co. v. Tweed, 7 Wall. 44, 74 U.S. 44, 19 L.Ed. 65. However, in matters like this, the criterion governing liability is whether the person creating the danger could or should reasonably have foreseen that the accident might occur. If such were the case, then he is liable notwithstanding the intervening cause. See 38 Am.Jur. Verbum ‘Negligence’ § 70, pages 726, 727.”
See also Comment, “Proximate Cause In Louisiana”, Vol. XVI Louisiana Law Review 391 (1956), 399-400:
“The presence of causes intervening subsequent to defendant’s act which brings about injury presents no special problem. In such cases, the inquiry of the court is simply whether the risk produced by the combination of defendant’s act and the intervening cause is one which is within the scope of protection of the rule of law upon which plaintiff relies. * * * In cases of this kind, the courts ordinarily use the ‘foreseeability’ formula previously mentioned, and indicate that ‘foreseeable intervening forces do not supersede defendant’s negligence.’ ”
In urging that Consolidated’s employee was not negligent in parking his truck across the main railroad track and in not removing his truck sooner upon the approach of a train, the defendants place great reliance upon an agreement of August 31, 1933, between Consolidated and the L & A pertaining to use of a spur track constructed between Consolidated’s warehouse and the main line of the railroad, especially paragraph 13 thereof, which is quoted at Footnote 1 of the original opinion of this court.
*812 As we held in our original opinion, such agreement and the customary presence of trucks near the railroad track may well be one of the circumstances to be taken into consideration in a conflict between the railroad and Consolidated as to which party had the last clear chance to avoid an accident resulting from the presence of Consolidated’s trucks on the track; but when a third party is injured through the action of Consolidated’s employee in creating a foreseeable risk to others by blocking the main railroad line, such agreement between Consolidated and the railroad cannot have the effect of lessening either’s duty to other members of the public.
Actually, although two of Consolidated’s employees did testify that trains on the main line had been compelled to stop on many occasions over the years by trucks parked at the Consolidated warehouse '(Tr. 431, 433, 440, 451, 452), the testimony of the railroad employees indicated that, although trucks were frequently parked so as to protrude across the main line, these trucks had moved out upon the advance of the train so as to occasion only on several occasions the need for an emergency stop (Tr. 16, 41, 98-99, 250, 254, 282-283). Also, by reference to the above-quoted agreement, Consolidated was granted the right to use the space betzveen the main line and the spur and not to block the main line, and Consolidated .was required by the agreement to “at all times have a driver in charge of any vehicle using this driveway alongside of the tracks, so as to immediately move said vehicle on the approach of trains or as otherwise necessary.”
The circumstance that Consolidated’s negligence in blocking the main line on previous occasions had not resulted in injury to others cannot serve to excuse such negligence when the repetition of the negligent conduct ultimately did result in injury. “Custom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case, but it is not conclusive or controlling, for the customary way of doing a thing may be a negligent way and may create a false standard of care, and, once negligence is established, such negligence cannot be justified by custom.” Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627, 629-630.
Having found that Consolidated’s negligence contributed to the accident, the defendants are liable for the harmful consequences (if any) thereof sustained by the plaintiff, including (if proved to have been a consequence thereof) the disabling heart condition of which the plaintiff complains. See Bergeron v. Houston-American Insurance Company, La.App. 1 Cir., 98 So.2d 723, certiorari denied; Lynch v. Fisher, La.App. 2 Cir., 41 So.2d 692.
II. Injuries Resulting from Accident.
As an immediate result of the above accident of October 16, 1956, plaintiff claims to have sustained a hernia; and, as a consequence of surgery to repair the hernia, he contends that he sustained a myocardial infarct (heart attack) which permanently disabled him. The defendant denies that the hernia resulted from the accident in question, and further denies that the plaintiff has proved any causal relationship between the surgical operation and the subsequent heart attack.
The evidence without contradiction reflects that the plaintiff was found at least by October 22 to have sustained a hernia, which was surgically repaired on October 27th. Also there is no dispute that plaintiff is now permanently and totally disabled by reason of a heart condition which without contradiction manifested itself at least by November 9th, although the plaintiff contends that such heart condition results from an attack which manifested itself on October 27th as a consequence of the surgery.
The defendants contend that the hernia and its after-effects did not result from *813 the accident of October 16th, primarily relying upon a claim form executed by a doctor’s employee on October 22, 1956, allegedly based on a history supplied to him by the plaintiff, which states that the accident causing the hernia had taken place in September when the plaintiff was working near Alexandria on another train. The defendants also seem to rely upon alternative allegations concerning such earlier accident urged alternatively in another suit by the plaintiff against his employer, the L. & A. railroad, which alternative allegations the plaintiff’s counsel argues were included by him in the petition in the other suit simply as a precaution in view of the clerical error in the doctor’s claim form of October 22nd.
The plaintiff testified positively that at the time of the accident he felt a stinging pain in his groin and was hurt. The railroad employee on duty with him in the caboose corroborated that immediately following the accident the plaintiff complained that he was hurting and that on account of such complaints the plaintiff remained in his seat at the stop rather than walking up to the front of the train. The plaintiff further testified that the hurting in his groin persisted and that the next morning he noticed a small swelling and blueing at the site of the pain, but that he did not go to a doctor at first because very often accidental hurts cured themselves.
However, in Alexandria several days later he became nauseated and then reported to the company’s doctor at Alexandria, who found that the plaintiff was herniated. The plaintiff stated that he had also told the doctor’s employee who typed the claim form about a minor leg injury he had sustained in September while trying to catch the caboose (which injury had not required medical treatment), in addition to informing him of the October accident; but that, in completing this minor clerical form, the doctor’s employee had apparently through misunderstanding noted the incorrect information. The plaintiff’s account is corroborated to some extent by the circumstance, brought out by the defendants’ cross-examination, that he had reported only the October accident as the cause of his hernia in his official “lost time” report completed on October 23rd (the next day) to his employer (Tr. 377), as well as by the un-contradicted accident that it was only after the second or October accident that the plaintiff commenced complaining of pain in his groin, from which he suffered almost continuously up through the medical examination six days later when the hernia was discovered.
Ultimately, whether plaintiff’s credibility and those of the supporting witnesses to his apparently credible version that the hernia resulted from the October accident should be regarded as lessened by such mistaken claim form depends upon whether the plaintiff’s explanation of the mistaken claim form is accepted as reasonable under all the circumstances. We do not find manifest error in the jury having accepted the plaintiff’s version of the incident and the surrounding circumstances as against the testimony of the claim employee who under the plaintiff’s version through a misunderstanding took down the wrong information in completing the form. “The determination of which set of opposing witnesses is testifying truly is primarily for the trier of fact, and the factual determinations of the trial court should not be disturbed upon review except 'in the case of manifest error. This principle of appellate review applies also to trials by jury, and it is further to be noted that the jury verdict herein was approved by the trial judge in his denial of the plaintiff’s motion for a new trial (citations omitted).” Thomas v. Mobley, La.App. 1 Cir., 118 So.2d 476, 481.
Plaintiff’s most substantial claim for damages, however, arises not from the hernia, which we find to have resulted from the accident of October 16th, but *814 from a serious and permanently disabling heart condition which is alleged to have been precipitated by the surgery to repair the hernia and its after-effects.
The hemiaplasty operation was performed under general anaesthesia and without incident on October 27, 1956. However, that evening the plaintiff experienced nausea, vomiting and retching, together with a slight elevation in temperature and some pulse change.
Plaintiff’s attending physician, Dr. Chester Williams, a general surgeon and admittedly not a cardiologist, felt that the plaintiff might be experiencing a myocardial infarction and thereupon called Dr. Roger Reynolds, a cardiologist, into consultation that same evening. Dr. Reynolds examined the plaintiff and ordered an electrocardiogram taken, a study of which and of a cardiogram taken forty-eight hours after the first, failed to confirm a diagnosis of infarction.
Based upon the opinion of Dr. Reynolds that the plaintiff had not experienced an infarction, Dr. Williams permitted the plaintiff to become ambulatory a day or two thereafter. The plaintiff was permitted to return home on November 1st. However, at ten in the evening on November 9th, eight days later, the plaintiff did experience a near-fatal infarction, confirmed by electrocardiogram. He is admittedly permanently disabled and has been under Dr. Reynolds’ care and treatment since that time.
The defendants essentially contend that the disabling heart condition resulted from an attack on November 9th, eight days after the plaintiff’s discharge from hospitalization, independently of any cause through the surgery and its after-effects. The plaintiff contends, relying on Dr. Williams’ positive testimony to such effect, that the plaintiff’s disabling heart condition resulted from the strains and complications of surgery and its after-effects and was first instanced by the attack of November 1st.
The defendant relies on the testimony of Dr. Reynolds that the initial seizure was not a heart attack, and also of two other specialists who had never seen the plaintiff but who from his hospital records and history opined that plaintiff had not sustained an infarction immediately following the accident.
In our opinion there is no error in the obvious finding of the jury that plaintiff’s present serious and permanent disability resulted from a myocardial infarction caused as an aftermath of the surgery and while the plaintiff was still hospitalized on November 1st, substantiated as we believe it to be by the following substantial evidence:
During the night following the surgery of October 27, 1956, he began having a severe chest pain, which his attending physician, Dr. Chester Williams, believed was a heart attack (coronary thrombosis), so that he immediately called in Dr. Roger Reynolds, an internist, for consultation. Dr. Reynolds found no significant changes on the two cardiograms taken within the 48 hours of the seizure so that Mr. Spiers was permitted to go home on November 1, 1956. Dr. Williams did, however, note that the plaintiff had sustained a possible myocardial infarction without electrocardio-graphic confirmation, which confirmation the evidence reveals usually but does not necessarily obtain in the case of heart attacks.
On November 9, 1956, Mr. Spiers sustained what was admitted to be a heart seizure, and nearly died, which subsequent electrocardiograms revealed to be a myocardial infarction on the posterior surface of the heart. Mr. Spiers remained under Dr. Reynolds’ care subsequently. The symptoms and actions of plaintiff during the first and second attacks were practically identical, except that the second was much more severe.
In view of this sequence, Dr. Chester Williams was absolutely positive that his patient, the plaintiff, had suffered a heart *815 attack at the time of the first severe chest pain; that Dr. Reynolds was mistaken in his diagnosis that none had occurred; and that both doctors had been in error in releasing Mr. Spiers from the hospital following the first attack. This very positive opinion of the attending physician, confirmed as it is by the circumstances that Spiers had indeed suffered severe chest pains which caused the attending, physician to believe a heart attack was in process at the time, is in our opinion entitled to such weight as would entitle the jury to expect to find, in the light of the surrounding circumstances and the admissions in the other medical testimony, that the heart condition resulted from the first seizure of October 27th- and was thus causally related and a direct consequence of the hernia resulting from the defendants’ truckdriver’s negligence.
Defendants rely greatly upon the testimony of Dr. Reynolds, the internist, whose clearance had permitted Mr. Spiers to leave the hospital about six days after the first seizure, who was of the ultimate opinion in his original diagnosis that no heart attack had occurred.
It was not manifestly wrong for the trial jurors to discount to some extent this opinion, because jurors as well as ourselves are familiar with the conscientious specialist who sincerely (or . sometimes stubbornly) does not wish to admit a mistake, especially a mistake that nearly caused a man to die, and because Dr. Reynolds, in his apparently straight forward and honest testimony, admitted that it was possible that the vomiting and other straining following surgery could have provoked a heart attack during the first time in the hospital, as a result of which Dr. Reynolds frankly admitted “I do not know whether he had a heart attack immediately after the operation or not.” This specialist further admitted that three circumstances seem to support a heart attack at the time of the initial severe chest pain; (1) The severe chest pain of the second 'seizure occurred in the same area and in the same pattern as it had the first time; (2) following the second seizure when Spiers was hospitalized, his blood sedimentation test was greatly elevated, whereas after heart attacks it usually takes two days for such tests to be elevated, .which would seem to indicate that there had been a heart attack earlier than on the night of the second seizure; and (3) the electrocardiogram taken on the second hospitalization showed definite evidence of a heart attack on the back surface of the heart, whereas usually the electrocardiogram goes through certain characteristic changes in the first few days- which it did not go through following the second attack, , so; that the plaintiff’s cardiogram “did not show thpse first early changes, characteristic changes, but were more suggestive of something that happened previously.” (Tr. 190 — 194 for all this testimony.) - -
As an illustration that this apparently conscientious physician Was no longer certain that the seizure in the hospital on October 27th as a result of the complications following surgery was not, in the light of aftersight, the precipitating and disabling heart attack, we quote Dr. Reynold’s testimony at Tr. 199 et seq.
“A. The 27th. In retrospect I believe that the pain that he was having the day I saw him immediately after the operation was coming from his heart, yes, sir. (Emphasis added.)-
“Q. And that would be strictly— how would you describe that in medical terminology, the heart condition? A. I think that anyone who has a heart attack must have some underlying disease of the coronary arteries. In view of what happened in the next couple of weeks and in view of the factors I recited in previous testimony I believe that the pain he was having that day was coming from his heart and I believe it was coming because the heart was getting insufficient blood for the requirements, for the work that it was having to do. The medical term that you would apply under those *816 circumstances depends upon a number of factors. The word 'angina’ refers to a temporary condition in the heart where the — -it is temporary insofar as the pain is concerned and temporary insofar as the severe insufficient supply of blood to the heart muscle is concerned. For instance, people with angina will have pain a few minutes and with rest it may disappear. On the other extreme is a myocardial infarction and that is a state where the blood supply is so poor or so lacking that the heart muscle actually dies, it goes away. Now, in between these two extremes you see people whose pain last quite some time, whose electrocardiograms may show some changes which may be temporary in nature, and the term that has been proposed for that is coronary insufficiency. That would be a mid-way term between angina on one hand and a real heart attack on the other hand.
“Q. Now, would you say this myocardial infarction that Mr. Spiers ultimately suffered was highly probable or perhaps inevitable at some time in view of his basic underlying condition? A. I think if he had not have had something else first he would have eventually had a heart attack, yes, sir.
“Q. And I gathered from what you said the first time you were able to say with supporting evidence this heart muscle had died was with the EKGs that you took perhaps on the 9th or 10th of November. A. Yes, sir, on the second admission, yes, sir.
“Q. Now, could you say whether Mr. Spiers’ present disability was directly caused by the operation for hernia? A. My letters to both sides, I said I did not know for sure.”
Thus substantial testimony supports the jury’s evaluation and factual finding that the straining and retching following the surgery (which was caused by the accident) caused a heart attack while Mr. Spiers was hospitalized so that the pain, worry, mental anguish, shortening of life and permanent disability was a direct consequence of the accident negligently caused by the defendant’s insured.
III. Quantum.
It is stipulated that recovery will be limited to $50,000, the policy limit.
Plaintiff Spiers was employed by the railroad at $675 per month, so that for instance he has lost approximately $30,-000 in wages to date. In addition he has an additional working-life expectancy of nearly 10 years assuming retirement at 65, with a future additional loss of wages thus amounting to some $80,000, not discounted. His estimated present and future medical expenses amount to approximately $8,000, and of course his pain and suffering and the mental anguish in knowing that every moment he lives may be his last is also entitled to a substantial award.
Since the minimum award to which the plaintiff under these facts is entitled is far in excess of $70,000, it is unnecessary for us to discuss whether the defendants are entitled to any credit for the amount of $20,000 previously paid to the plaintiff for his injury in settlement of the suit against it, by the Louisiana and Arkansas Railway, the plaintiff’s employer, and the jury’s award to the plaintiff of the $50,-000 sought is accordingly affirmed.[2]
IV. Alternative Prayer for a New Trial.
Alleging prejudicial error in the conduct of the case, the defendants-appellants alternatively pray for a reversal and remand of these proceedings for a new trial *817 Other grounds previously urged (such as the alleged disqualification of two jurors) not being specified, we will assume such have been abandoned and will discuss briefly only those remaining grounds re-urged by the defendants-appellants in their application for rehearing which was granted.
The defendants-appellants contend that they sustained prejudice by the admission into evidence over their objection of a release executed by the plaintiff and the L & A on June 6, 1958 (P-18). However, the defendants by Article 30 of their answer had pleaded such release as “an absolute bar of any right of recovery herein” in this suit against Consolidated and its insurer, and its admission was of course permissible to show that it was a restricted release specifically reserving rights against Consolidated in the present suit (see Art. 2, Tr. 321). Further, the trial court cautioned the jury to disregard any language which might be construed as indicating negligence on the part of the present defendants (Tr. 323).
The defendants also complain that over their objection the trial court improperly allowed the examining physicians to testify that when they examined the plaintiff in October, 1956, several days after the accident, he told them that he had sustained the hernia in the present jolting accident in October, thus corroborating his testimony that the hernia resulted from the present accident rather than from trying to step onto the train in September. Aside from cautionary remarks by the trial judge preventing prejudice, we think these to be instances where “a physician may sometimes testify as to the history of an injury or illness given to him by a patient for the purpose of diagnosis or treatment if the condition related to the injury or illness for which the patient was seeking treatment was relevant to the issues then under inquiry.” 20 Am.Jur. “Evidence” Section 628, p. 531 (1960 Cumulative Supplement, p. 98).
Citing State v. Bailey, 165 La. 341, 115 So. 613, 58 A.L.R. 1, and Billington v. Schaal, 42 Wash.2d 878, 259 P.2d 634, the appellants further contend that it was error to permit the attorney for the appellant to read from the criminal statutes in his argument to the jury and that the trial court’s cautionary remarks did not prevent prejudice. The cited cases are completely inapplicable and do not involve the question under consideration; but even conceding that error is shown, we do not believe that under the circumstances it was prejudicial and constitutes grounds for reversing the verdict of the jury. Miller v. Miller, 160 La. 936, 107 So. 702. “So, in the absence of prejudice, the court will not reverse because of the action of counsel in appealing to race prejudice, referring to the poverty or wealth of the parties, reading part of the pleadings to the jury, reading law to the jury, * * 5A C.J.S. Appeal & Error § 1713, p. 865. (Emphasis ours.)
Taking the record as a whole, we believe that the plaintiff has proved his case by a preponderance of the evidence and that no manifest error is shown in the jury verdict awarding him the full amount of his prayer.
Decree.
For the foregoing reasons the judgment of the trial court is affirmed.
Affirmed.

. The writer of this opinion still retains the view that a jury finding that the engineer , could not reasonably observe the defendant sooner is not manifestly erroneous based upon uncontradicted sworn testimony in the record, uncon-tradicted only by what the writer feels to have 'been photographs insufficiently authenticated as reflecting the scene at the time of the accident a year and a half earlier. It is unnecessary however to discuss this view, with which all of the members of the majority do not necessarily agree, in view of our holding that Consolidated’s negligence contributed to the accident.

. See concurring opinion in Rice v. Traders & General Insurance Company, La. App., 114 So.2d 92, wherein the writer expressed some doubt that such credit by voluntary settlement from potential tortfeasor is available to another tort-feasor cast by judgment. See also Johnson v. Whitfield, La.App., 1 Cir., 89 So.2d 413 (Syllabus 4).