BARRY, Judge,
dissents with reasons:
The majority concludes that, despite the trial court’s erroneous jury instruction to the effect that NOPSI’s liability “stopped at the meter,” the evidence was insufficient to sustain a verdict against NOPSI and the error was therefore harmless. I disagree.
There was conflicting testimony as to the cause of the fire. Mrs. Baquet, the burned child’s mother and operator of the beauty salon where the fire occurred, testified she smelled gas in the salon, particularly in the bathroom, from the day she occupied the premises until the day of the fire. She testified the odor was strongest in the bathroom and was worse in the morning, after the door had been closed all night. Despite six or eight service calls by NOPSI servicemen, the gas odor never subsided.
The uncontroverted evidence at trial established that, on November 27,1972, NOP-SI was contacted about a suspected gas leak and its serviceman discovered a gas leak of four cubic feet per hour. He was unable to locate the leak so he sealed off the valve, shackled the meter, and advised the building owner to contact a plumber. The following day Nick Accardo, a licensed plumber, made temporary repairs, unlocked the meter and turned the gas on. On December 7, 1972, another NOPSI representative made a follow-up inspection and reported no leaks.
Thereafter, and prior to the accident on April 14,1973, there were other visits to the premises by NOPSI servicemen. Plaintiff testified these calls were in response to further complaints of a gas smell or gas leaks, while NOPSI maintains they were merely to re-light the hot water heater. In *925 any event, Mrs. Baquet stated, and two NOPSI servicemen confirmed, water was found in the gas pipes on several visits. On December 16, 1972, Mr. Smith, a NOPSI representative, reported he “found water in fuel line. Advised owner to install drip.” Mr. Richardson, another NOPSI serviceman, inspected the pipes on January 11, 1973, and noted, "... Check out lines tight. Found water in lines. Meter and service clear, see water in drip. Disc, fuel line on ledge of second story. Clear water temp. Adv. party to install drip and run correct fuel lines. Adv. party meter in warm location and fuel line in cold air and the warm causing condensation in line. Ref. to plumber to run lines correct and remove copper line.”
Mrs. Baquet’s testimony corroborates the written reports of NOPSI’s servicemen that they had discovered water in the supply lines on at least two occasions:
[A] Public Service man ... told me they had condensation in the pipe and it was from the gas pipes going in and out of the building with the heat and the cold ... and then once after that another gentleman came and he told me he drained eight ounces.
Mr. Cohen, the defendant landlord, testified a NOPSI employee told him the heater’s pilot light kept going out because of condensation in the line and advised him to have a drain pipe installed.
Mr. Brumfield, another NOPSI serviceman, testified water in fuel pipes can be dangerous. He said it is NOPSI’s policy, when water is discovered in a customer’s pipes, to turn off the gas and have a plumber remove the water. Mr. Brumfield also stated NOPSI’s standard procedure is to make a follow-up call after a leak is found to verify proper repairs were made.
Mr. Pappas, plaintiff’s expert in fire and explosion investigation and gas chromatography, confirmed that water in fuel lines can cause dangerous leaks:
Now, water in natural gas will form what we call hydrates; it is a white solid. Now, if it forms in the service lines it is a very bad situation "because what happens is that it can interfere with your burners, it can interfere with the automatic control valve. It can work and bum but it will not close absolutely tight when the pilot light causes it to cut off. So this means that you can on occasion get gas leaking from the burner itself.
After NOPSI’s serviceman again discovered condensation in the lines on January 11,1973, plaintiff’s landlord contracted with the plumber, Nick Accardo, to re-route the gas lines. Accardo testified he ran new pipes outside the building, completing the work on February 1, 1973. Although the New Orleans Building Code requires a plumber to obtain a permit from the City Safety Director before performing such repairs, Accardo testified he did not secure such a permit because NOPSI usually decides if a permit is necessary. He admitted the purpose of the ordinance requiring a permit is to insure that the City will conduct a safety inspection after completion of the work; nonetheless, NOPSI did not insist that Accardo obtain a permit, nor did it turn off gas transmission through those pipes while the work was being performed. Despite its established policy of making follow-up inspections after work on a gas customer’s lines, no representatives of NOPSI ever returned to the premises to inspect or approve the plumber’s work. Thus, in January of 1973 NOPSI was aware of a dangerous condition (condensation in the gas pipes) but failed to verify the problem had been corrected and continued to supply gas to plaintiff’s salon until the date of the explosion. Plaintiff’s witnesses testified the gas odor did not subside or disappear after the completion of the plumber’s work on February 1, 1973.
Those who handle natural gas are under a duty to exercise “extraordinary care” to protect the public. Reggio v. La. Gas Service Co., 333 So.2d 394, 403 (La.App. 4th Cir.1976), Royal Ins. Co. v. Fidelity & Gas Co. of New York, 256 So.2d 352 (La.App. 1st Cir. 1971).
While a gas supplier normally has no responsibility for pipes in a customer’s building, or for the manner in which they *926 ' are maintained, it is liable for injuries caused by a leak “beyond the meter” of which it has knowledge. Loyocano v. La. Power & Light, 165 So. 515, 519-20 (Orl. App.1936); Huggins v. Hartford Accident & Indemnity Co., 271 So.2d 876, 878 (La.App. 4th Cir.) writ refused 274 So.2d 391 (1973).
I do not dispute that NOPSI presented substantial, perhaps convincing, evidence that the fire was caused because the child spilled gasoline near the hot water heater. Even if the fire was caused by a gas leak in the pipes, there is a question as to whether the fire can be attributed to NOPSI’s negligence. However, I am convinced that determination of the cause of the fire (the presence or absence of a natural gas leak(s) and NOPSFs knowledge of any such leak(s) or other dangerous conditions) was clearly a factual question for the jury. While the jury could reasonably have found the fire was caused by spilled gasoline or from a gas leak beyond the meter and unknown to NOPSI, the jury could also rationally have found the explosion resulted from a dangerous condition within NOPSFs knowledge. The Judge’s charge that NOPSFs liability stopped at the meter totally estopped the jury from deliberating NOPSFs negligence, even if it believed NOPSI was aware of leaks or dangerous conditions which caused the explosion. The Judge’s charge was tantamount to a directed verdict in NOPSFs favor.
On appellate review of a jury trial the mere discovery of error in the Judge’s instructions does not, of itself, justify the appellate court conducting the equivalent of a trial de novo. It is appropriate to measure the gravity or degree of error in light of all the instructions and the facts of the' case. But if a jury charge is so incorrect or inaccurate as to preclude a jury from reaching a verdict on the law and facts, the manifest error standard may be ignored. Gonzales v. Xerox Corp., 320 So.2d 163 (La. 1975).
Thus, the jury here was effectively instructed to ignore testimony and evidence relating to NOPSFs liability beyond the meter which precluded a verdict based on the law and facts. Accordingly, I respectfully dissent.